Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| CHANTELLE JONES, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF SARATOGA SPRINGS, a municipality; KEVIN NORRIS; WILLIAM ROBERTSON; ANDREW BURTON; and MARK CHRISTENSEN, <br><br> Defendants. | **COMPLAINT** <br> **&** <br> **JURY DEMAND** <br><br><br> Civil No. 2:23-CV-00019 <br><br> Judge _____ |

Plaintiff alleges and complains against Defendants as follows:

## <u>PRELIMINARY STATEMENT</u>

**1.** The following allegations are based upon the undersigned's understanding of the information presently available. This is a civil rights action in

1

which Plaintiff seeks relief for Defendants' violations of her rights guaranteed under the United States Constitution, specifically the Fourth and Fourteenth Amendments. These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. §1983 and §1988. This action also seeks relief under the Constitution of the State of Utah, specifically Article I, §7 and §14.

## <u>INTRODUCTION</u>

2.      This case involves actions of the officers and administration of the City of Saratoga Springs Police Department ("SSPD") and Mark Christensen, the City of Saratoga Springs City Manager from January 2019 to the present day.

3.      In January 2019, Chantelle Jones, her husband Warren, and their two children began to experience random acts of intimidation and threats. No one knew who was behind these acts.

4.      Chantelle contacted the SSPD, looking for protection and help in identifying the perpetrator[s].

5.      Rather than help her, officers of the SSPD arbitrarily and improperly decided that Chantelle was making up these events.

6.      In particular, Defendant William Robertson, SSPD Assistant Chief, ordered his officers and detectives to investigate Chantelle Jones and try to find evidence that would incriminate her.

**7.**     Robertson explained he was "tired of her" and that he wanted Chantelle "run out of the city."

**8.**     This led to officers searching Chantelle's home,  following her on errands, parking by or near her home, improperly and illegally attempting  to "pink sheet" her, and other improper law enforcement behavior.

**9.**     SSPD Officer Kevin Norris was involved in many of the early 2019 service calls to the Jones Residence. He was fully aware of Robertson's orders and the actions of his fellow officers.

**10.**     Norris purposefully and willfully used his knowledge of those orders to manipulate Chantelle's fears, telling her that SSPD was trying to charge her criminally and that he was the only member of the SSPD that was "on her side."

**11.**     Norris promised to protect Chantelle by giving her inside information regarding SSPD's efforts to charge her with criminal activity.

**12.**     Norris, subsequently, used his position of power over Chantelle to sexually assault her on two occasions.

**13.**     Norris also threatened Chantelle on several occasions that if she reported him or divulged his actions, she would suffer further adverse police action.

**14.**     Chantelle later reported Norris' inappropriate behavior to Assistant Chief Robertson.

15.     Robertson was dismissive of the allegations, telling Chantelle to just ignore them and "boys will be boys."

16.     Robertson also threatened that he would create trouble for Chantelle if she mentioned the inappropriate conduct to anyone.

17.     When one particular SSPD detective, Jared Chuchran, reported his suspicion that Norris had sexually assaulted Chantelle, Robertson threatened him with loss of his job.

18.     When the same detective filed a formal report against Norris, Robertson ordered the detective to be suspended and, later, fired.

19.     Mark Christensen, the City Manager, met regularly with Robertson and was aware of Chantelle's case.

20.     On behalf of Saratoga Springs City, Christensen supported Robertson's efforts to run Chantelle out of the city.

21.     Defendants have violated Chantelle's rights under the 4th and 14th Amendments to the United States Constitution and Article I, Sections 7 and 14 of the Utah State Constitution.

22.     Moreover, Norris, as an employee of Saratoga Springs, violated Chantelle's 14th Amendment rights to be free of sexual harassment and assault.

23.     Saratoga Springs, knowing of Norris' previous behavior in other

Utah police departments, knew or should have known not to employ him.

24.     After Norris was hired, Saratoga Springs failed to train and supervise him properly. As a result, Saratoga Springs shares liability for his actions.

## JURISDICTION AND VENUE

25.     This action arises under the United States Constitution and federal law, particularly under the Fourth and Fourteenth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983 and 1988.

26.     This action also arises under the Constitution of the State of Utah Article I, §§7 and 14.

27.     This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. §1343 and 42 U.S.C. §1983.

28.     As to the State Constitutional claims, this Court's supplemental jurisdiction is invoked under 28 U.S.C. §1367.

29.     The claims made in this Complaint occurred and arose in the State of Utah, in the Central Division of this District. Venue for the federal claims is therefore proper under 28 U.S.C. §§1391 and 1331.  Venue for the State claims is proper under 28 U.S.C. §1367.

30.     Plaintiff is seeking damages pursuant to the claims for relief specified below in amounts specified herein, and to be proved at trial.

31.     This Court has authority to award costs and attorney fees pursuant to 42 U.S.C. §1988, and pursuant to the Court's inherent power under State law.

32.     This action also seeks redress for violations of Plaintiff's constitutional rights secured by the Utah Constitution. This Court further has pendent jurisdiction over any and all State claims.

## PARTIES

33.     **Plaintiff Chantelle Jones** ("Chantelle") is a resident of Salt Lake County, State of Utah. She was at all relevant times herein a resident of the City of Saratoga Springs, Utah County, Utah.

34.     **Defendant City of Saratoga Springs City** ("CSS") is a political subdivision of the State of Utah. The City of Saratoga Springs has a law enforcement branch known as the Saratoga Springs Police Department (SSPD) which is authorized to operate by CSS and is legally responsible for the acts of its employee officers. The City of Saratoga Springs funds and supervises the SSPD and is legally responsible for the acts of its employee officers that are within the course and scope of their employment. The CSS, through the actions of SSPD officers Burton,

Robertson and Norris, is a "person" within the meaning of 42 U.S.C. §1983. Officers Burton, Robertson, and Norris, as well as City Manager Christiansen, were at all relevant times herein state actors.

35.   **Defendant Kevin Norris** ("Norris") was at all relevant times herein an officer with the SSPD, a department of the City of Saratoga Springs, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

36.   **Defendant William Robertson** ("Robertson") was at all relevant times herein the Assistant Chief of the SSPD, a department of the City of Saratoga Springs, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

37.   **Defendant Andrew Burton** ("Burton") was at all relevant times herein the Chief of the SSPD, a department of the City of Saratoga Springs, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah.

38.   **Defendant Mark Christensen** ("Christensen") was at all relevant times herein employed as the city manager of the City of Saratoga Springs, operating in the course and scope of his employment.

# STATEMENT OF FACTS

**39.** Chantelle and her family moved to CSS in May 2018.

**40.** Starting in January 2019, the family began to receive random threats through notes and letters which would be placed on their house or cars.

**41.** After January 2019, the random threats grew into vandalism and destruction of property.

**42.** Concerned for her family's safety, Chantelle contacted the SSPD asking for help in identifying the wrongdoers.

**43.** Based upon information and belief, during March 2019, Robertson met with SSPD Chief Andrew Burton regarding Chantelle Jones' case.

**44.** Chief Burton delegated management of the case in its entirety to Defendant Robertson.

**45.** After March 2019, Robertson met regularly with Burton to update him on Chantelle's case.

**46.** Burton approved Robertson's actions regarding the case.

**47.** After March 2019, Robertson also met regularly with City Manager Mark Christensen to update him on Chantelle's case.

**48.** Christensen approved Robertson's actions.

**49.** Chief Burton had final policymaking authority for the SSPD.

50.     Mark Christensen had final policymaking authority over all CSS staff and department heads, including the SSPD.

51.     In March 2019, Chantelle became acquainted with SSPD Officer Kevin Norris who had been assigned to investigate Chantelle's claims.

52.     On multiple occasions between March and June 2019, Norris told Chantelle that the SSPD did not believe her story.

53.     Norris told Chantelle he was the "only advocate" her family had with the SSPD.

54.     Norris told Chantelle multiple times that the SSPD was considering charges against her.

55.     Norris told Chantelle that he was the only one that could protect her from criminal charges.

56.     Norris told Chantelle he would provide inside SSPD information about her case to help her avoid criminal charges from the SSPD.

57.     There was a significant "power imbalance" between Chantelle and Norris because of Norris' position as a police officer and the reliance and fear that Norris had induced in Chantelle because of his representations about the SSPD's efforts to drive her family out of town.

58.     Norris' actions were a planned effort to manipulate Chantelle

into believing that he was the only person who could protect her.

59.     Norris' intentions were to place himself in a position of power over her so that he could take sexual advantage of her.

60.     Norris had been accused of similar practices at other police departments in the State of Utah where he had been employed.

61.     SSPD was fully aware of the prior accusations regarding Norris' predatory habits.

62.     In April 2019, Norris gave Chantelle a Tracfone so that he could communicate privately with her without anyone else in SSPD knowing.

63.     Norris explained to Chantelle that the Tracfone would make it easier for him to share with her inside SSPD information without him getting into trouble.

64.     On a number of occasions during April and May 2019, Norris invited Chantelle to drive with him in his personal truck so that he could, ostensibly, discuss the status of the case with her.

65.     Relying on Norris' status as a police officer for SSPD, Chantelle agreed to drive with him in his truck.

66.     At the end of May 2019, during such a drive in Norris' personal truck, Norris attempted to kiss Chantelle.

**67.**   He stopped only after she told him his conduct was not appropriate.

**68.**   During the early morning hours of June 29, 2019, Chantelle was forced off the road by a vehicle that was following her too closely.

**69.**   In the accident, Chantelle suffered a seriously broken nose and two black eyes.

**70.**   Later in the day on June 29, 2019, Norris and other officers arrived at Jones' residence to take photographs of her injuries and conduct a follow-up investigation of the crash.

**71.**   Chantelle reported to the officers that she was alone with her daughter because her husband and son had gone out of town to visit family.

**72.**   As the other officers left, Norris surreptitiously handed Chantelle a note requesting Chantelle to send Norris an e-mail the next day, June 30th, asking him to come back to the house for additional follow-up on the accident.

**73.**   On June 30, 2019, believing that Norris had additional information regarding the SSPD investigation he wanted to discuss privately, Chantelle sent Norris the e-mail as requested.

**74.**   Even though Norris was on duty on June 30th, he arrived at the residence in plain clothes.

**75.**     Norris told Chantelle that SSPD was becoming very serious about processing criminal charges against her.

**76.**     Chantelle began to cry.

**77.**     Norris hugged Chantelle and would not let her go even though Chantelle tried to end the hug.

**78.**     Norris then sexually assaulted Chantelle.

**79.**     Chantelle resisted, saying "no" multiple times, but Norris forced her, and Chantelle did not have the strength to stop him.

**80.**     At the time of this event, Norris was approximately 6'6" and weighed about 225 pounds.

**81.**     Chantelle did not want to scream because she didn't want to scare her daughter who was downstairs.

**82.**     Norris did not stop.

**83.**     Chantelle was very upset and ordered Norris to leave. Later she texted Norris and told him never to come back to her house.

**84.**     Later that day, Norris left Chantelle a note at the house requesting forgiveness for what he had done.

**85.**     On July 3, 2019, Chantelle, still not feeling well after the accident, stayed home an extra day before joining her family on vacation.

86.     During the day on July 3rd, Norris texted Chantelle apologizing for his actions on June 30th.

87.     Norris realized that Chantelle had not yet left on the family vacation as planned.

88.     On July 4, 2019, Norris texted and asked Chantelle if she wanted to go on a drive.

89.      Chantelle, once again believing that he wanted to discuss the SSPD investigation, agreed to go with him.

90.     Norris arrived at the Jones' residence in an SSPD truck, in uniform.

91.     Believing that a police truck would be safe, Jones went with Norris.

92.     Norris began to explain how serious SSPD was in prosecuting her criminally.

93.     Chantelle began to cry.

94.     Norris reached out and hugged her. He would not let her go.

95.     Norris then sexually assaulted Chantelle.

96.     Chantelle tried to resist, but because of Norris' size and her facial injuries there was little she could do.

97.     Norris threatened Chantelle that if she ever reported the two incidents to anyone, he would no longer protect her from SSPD's potential charges against her and that she would be prosecuted.

98.     Chantelle believed Norris' falsehoods when he said that he was the only one at SSPD who was willing to protect her and her family.

99.     Chantelle feared that if she offended Norris, he would stop helping her and she would be left to fend for herself against the SSPD.

100.     Chantelle reported to SSPD Detective Jesse Davis on four separate occasions that one of the SSPD officers had said and done inappropriate things to her. These conversations occurred twice in July 2019, where Detective Davis made the comment that you just have to "ignore these guys," and "boys will be boys."

101.     Chantelle also related inappropriate statements and actions by "one of the SSPD officers" by e-mail in November 2019 and by letter in November 2019.

102.     On or about July 2019, SSPD Detective Jared Chuchran became involved in the case as the lead detective.

103.     During August 2019, Chantelle met Defendant Robertson for the first time. She told him that one of his officers had acted inappropriately with her.

104.   Robertson told her just to "ignore those things."

105.    Based on information and belief, during July and August 2019, Robertson ordered officers and detectives with the SSPD to (1) find evidence for felony or misdemeanor charges they could bring against Chantelle, even if they had to skew or falsify the evidence to do so; (2) intimidate Chantelle in any way, including following her, creating reasons to make traffic stops, etc.; and (3) find or create a way to "run her out of town."

106.   During August of 2019, Robertson specifically ordered Chuchran and other detectives to find evidence sufficient to screen charges against Chantelle with the Utah County Attorney and have her put in jail.

107.   Robertson again reiterated that he wanted her "run out of town."

108.   Because of their regular meetings, both Burton and Christensen were aware of Robertson's orders for Chantelle to be "run out of town." Both gave tacit and direct approval to Robertson's actions.

109.   On September 3, 2019, Chantelle had a medical emergency while driving her car.

110.   Norris was the first on the scene.

111.   Norris took possession of her vehicle for a period of 5 to 6 hours without keeping records of what he had done with the vehicle.

112. Norris took notebooks and a camera from the car which he knew contained evidence of his interactions with Chantelle regarding her case

113. On September 4, 2019, Chantelle tried to locate the notebooks and camera and texted Norris asking if he had taken them. Norris told Chantelle he did not have them.

114. Later that same day, Norris admitted to Chantelle that he did have the notebooks and camera, and that he had falsified evidence to protect himself.

115. He asked her to "go along" by "sending me positive e-mail back and say you found the notebooks."

116. Chantelle told him that she was sick of lying for him.

117. On September 11, 2019, a search warrant was served on Chantelle's residence by the SSPD taking approximately three hours to complete.

118. Based upon information and belief, the ostensible purpose of the search was to locate and identify incriminating evidence proving that Chantelle had made up or created the threats, vandalism and personal attacks which she was requesting the SSPD to investigate.

119. The real purpose of the warrant was to harass and intimidate Chantelle and her family.

120. Defendant Robertson personally participated in the search and

told Chantelle, "Just you wait and see what's coming to you!" He said, "You are a liar, and you are going to prison for a long time."

121.   When Chantelle explained her innocence and started to cry, Robertson said, "if you are going to get all sad, I can give you some rope and point you to the nearest tree."

122.   Chantelle reported to Robertson that one of his officers had attacked her sexually.

123.   Robertson responded, "You are a lying b---- and nobody will ever believe you."

124.   Robertson told Chantelle that he would destroy her if she ever again discussed a sexual attack by one of his officers.

125.   As the officers were leaving, one of them suggested to Chantelle that she get a polygraph to prove she was telling the truth.

126.   Nothing to support a criminal charge or any other charge was found at the Jones residence or on electronic equipment taken by the SSPD.

127.   Later, one of the detectives involved in securing the search warrant admitted they searched Chantelle's house because Robertson was pressuring them to find or create a reason to arrest her.

128.   During August through December 2019, Norris continued to tell

Chantelle he was protecting her family from SSPD, and that without him she would be criminally charged and go to jail.

129.    On or about September 13, 2019, Chantelle, not divulging Norris' name, told Chuchran that an officer from SSPD had sexually assaulted her.

130.    On September 17, 2019, Chuchran and other SSPD officers fraudulently and forcefully "pink sheeted" Chantelle and took her to Utah Valley Hospital where she was strip searched and questioned.

131.    She was permitted to leave because the hospital could not find any justification to continue holding her, i.e., she was not a "substantial threat" to herself or others.

132.    On September 25, 2019, Chantelle submitted to a polygraph test with Intermountain Polygraph Services regarding the reported incidents of threats and vandalism. She easily passed the test.

133.    Soon after, Chantelle offered the polygraph information to SSPD personnel, as requested, to support her claims. They would not accept it.

134.    In a telephone call on or about October 25, 2019, Chantelle reported to SSPD Officer Lambson that an officer had been inappropriate with her and provided some details. Officer Lambson was quiet for a moment and then asked, "is that all?" after which she abruptly ended the conversation with Chantelle.

135.   Officer Lambson later related this to Lt. April Morse during her interview for the IA Investigation against Norris, and stated that, at the time, she, Officer Lambson, "didn't think it was a big deal," and that is why she never reported Chantelle's comments to anyone.

136.   On February 23, 2020, Norris called Chantelle to report to her that the police were coming that night to arrest her. He also told her he was going to kill her if she ever said anything about the sexual assault.

137.   On April 17, 2020, Chantelle found a GPS monitoring device on her car. She removed it. She believed it had been placed there by the SSPD without a warrant.

138.   She asked Chuchran about the device and did not receive an answer.

139.   Between February and May 2020, Norris continued to stalk Chantelle and her family. He also made threats to Chantelle, individually, regarding what he would do to her and/or her family if she ever revealed his actions in June and July 2019.

140.   On May 23, 2020, Norris reported to Chantelle that Chief Burton was asking other SSPD officers about Norris' relationship with her.

141.   Norris told Chantelle that SSPD was still pursuing criminal

charges against her.

142.   On June 10, 2020, Norris conducted a traffic stop on Chantelle without a stated reason.

143.   He was in a Saratoga Springs police vehicle with lights and siren operating.

144.   He was in full uniform.

145.   He did not ask for her driver's license or her insurance.

146.   He told her the stop was to "just check up on her to see how she was doing."

147.   She did not know when she saw the police vehicle's lights and heard the siren that Norris was operating the vehicle. She did not realize it was Norris until he came to her car, and she rolled down the window.

148.   Chantelle did not want Norris to stop her.

149.   She had not asked him or given him permission to stop her.

150.   The incident lasted for three to four minutes, after which Chantelle asked if she was free to go. Norris told her "yes" and Chantelle drove away.

151.   On June 14, 2020, Norris again carried out a traffic stop on Chantelle without a stated reason.

152.   He was in a Saratoga Springs police vehicle with lights and siren operating.

153.   He was in full uniform.

154.   He did not ask for her driver's license or her insurance.

155.   He told Chantelle she was not going to make it into work that night and that she was not free to leave.

156.   He told Chantelle that his body camera was turned off and that he could do and say anything he wanted. She needed to just listen.

157.   Norris said SSPD officers, namely Chuchran, were asking questions about his interactions with Chantelle.

158.   He threatened to use his police authority to get Chantelle criminally charged and convicted if she told anyone about his sexual harassment.

159.   She did not know when she saw the police vehicle's lights and heard the siren that Norris was operating the vehicle.

160.   She did not realize it was Norris until he came to her car, and she rolled down the window.

161.   Chantelle did not want Norris to stop her. She had not asked him or given him permission to stop her.

162.   Norris detained Chantelle for 15-20 minutes. She did not believe

she was free to leave.

**163.**    After Norris finished speaking to Chantelle, he walked back to his police vehicle and drove away with the lights and siren off.

**164.**    Chantelle noticed that Norris continued to follow her the rest of the evening.

**165.**    During the months of October and November 2020, Robertson consistently demanded that Chuchran prepare charges against Chantelle to be screened by the Utah County District Attorney's office.

**166.**    Even though Chuchran disagreed with Robertson's alleged charges, because Robertson was his supervisor and had ordered him to do it, Chuchran prepared twenty misdemeanor and two felony claims to be screened.

**167.**    After a meeting with Chuchran, Robertson, and three other officers, the Utah County District Attorney's office turned down prosecution on each and every claim.

**168.**    On or about February 2021, Chuchran had told Robertson that Chantelle's claims about sexual assault by an SSPD officer were true.

**169.**    Chuchran told Robertson he suspected Norris was the perpetrator.

**170.**    Chuchran asked Chantelle on multiple occasions to divulge the

officer's name. Chantelle did not divulge it because she was in fear due to Norris' threats.

**171.** Robertson vehemently disagreed with Chuchran's suspicions regarding Norris.

**172.** He threatened Chuchran with loss of his job if he ever reported that Norris had sexually assaulted Chantelle.

**173.** Robertson actively kept information about Chuchran's allegations regarding Norris from other officers in the SSPD and from Chief Burton.

**174.** Based on information and belief, Robertson did report on Chuchran's allegations regarding Norris to Christensen who agreed with Robertson to keep it from other officers.

**175.** Robertson did not want anything to distract officers from his prior orders to "run Chantelle Jones out of the city."

**176.** On February 22, 2021, Norris was starting to get nervous about Chuchran's investigation. Norris sent Chantelle a text stating, "Chantel (sic) you know to play nice," inferring that she needed to carefully watch what she said and did.

**177.** On April 28, 2021, Chantelle told Chuchran that Norris had sexually assaulted her on two occasions.

178. On or about April 29, 2021, Chuhcran formally reported to his line sergeant that Officer Norris, as Chuchran had suspected, had sexually assaulted Chantelle on two occasions in 2019.

179. Chuchran and his line sergeant took the information to Robertson that same day.

180. In retaliation, on April 30, 2021, Chuchran was suspended by Mark Christensen, at Robertson's request, from the SSPD for reasons allegedly unrelated to the Jones case.

181. An internal investigation was conducted by SSPD regarding Norris' actions.

182. Shortly after Robertson was notified of the sexual assault allegations, Norris was assigned to a desk job in charge of the SSPD vehicle fleet.

183. After May 2021, Norris continued to harass and stalk Chantelle and her family by, *inter alia*, following them in his personal vehicle and parking at or near their house at odd hours.

184. After May 2021, while in charge of SSPD vehicles, Norris had access to vehicle computers and Utah Bureau of Criminal Identification ("BCI") information.

185. During this time, Norris improperly and without authorization

accessed SSPD's account with BCI and did research on Chantelle's family, her relatives, and others.

186.   He also did research on Chuchran's family and his relatives.

187.   On or about March 2022, when his improper BCI searches were discovered, Norris resigned from his position at SSPD.

188.   Based on information and belief, if Norris had not resigned, he would have been fired by the SSPD.

189.   Since March 2022, SSPD officers have continued to harass, intimidate, and follow Chantelle Jones and her husband, Warren, and stake out their house on a regular basis.

190.   Norris was allowed to harass, threaten, stalk and intimidate Chantelle for almost two years until action was finally taken by Detective Chuchran. Even after a formal investigation began, SSPD failed to enforce the orders in place and ignored calls by Chantelle for help when Norris continued to drive past the Jones' home and follow members of the family.

191.   SSPD also allowed Norris to have access to computers which had on them personal information about the Jones family, even while he was being investigated for such a serious crime as sexual assault.

192.   Chantelle told Burton, Robertson, Chuchran and other SSPD

officers on numerous occasions both in person and through e-mails that she feared for her life.

193.   After coming forward about Norris, Chantelle directly told these SSPD officers and administrators that she thought Norris was going to kill her. But, they did nothing to protect her because they believed that she was making it all up.

194.   Because of the harassment, Chantelle and her family moved from Saratoga Springs to Bluffdale, Utah in June 2022.

195.   Bluffdale's law enforcement and police activities are contracted out to the SSPD.

196.   Even though Chantelle and her family have moved, the SSPD has continued its policy of harassment and intimidation against Chantelle by tailing her while she or her family are on errands, by stopping at or near her house, and by driving by her house.

# FIRST CAUSE OF ACTION

## *~ Sexual Harassment and Sexual Assault ~*

### *Violation of the Fourteenth Amendment*
### *Against Officer Kevin Norris in his Individual Capacity*

### Cognizable Under 42 U.S.C. §1983

197.   Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

198.   The Fourteenth Amendment Equal Protection Clause prohibits public officials, including police officers, from sexually harassing private citizens.

199.   This sexual harassment standard is "met by actions that amount to an abuse of governmental authority for the purpose of one's own sexual gratification." *Sh.A ex rel. J.A. v. Tucumcari Mun. Schools*, 321 F.3d 1285, 1289 (10th Cir. 2003).

200.   "It is firmly established that a defendant acts under color of law when *he abuses the position given to him by the State*." *Johnson v. Martin*, 195 F.3d 1208, 1218 (10th Cir. 1999) (italics in original) (quoting *West v. Atkins*, 487 U.S. 42, 49-50 (1988)).

201.   Sexual harassment by a police officer violates a citizen's 14th Amendment rights. In a recent case involving a UHP Trooper, the Tenth Circuit held:

> The Fourteenth Amendment's Equal Protection Clause prohibits a state actor from engaging in discriminatory conduct. … And sexual harassment constitutes sex discrimination under our jurisprudence. … So **a state actor violates the Equal Protection Clause of the Fourteenth Amendment when he commits sexual harassment**.

*Shepherd v. Robbins,* 55 F.4th 810, 816-817 (10th Cir. 2022) (emphasis added).

202.   Starting in early March 2019, Officer Kevin Norris began grooming Chantelle by telling her that SSPD wanted to criminally charge her based

on the reports she was making to SSPD regarding vandalism and threats to herself, her family, and her property.

203.   Chantelle became rightfully concerned and afraid for her own safety and that of her family.

204.   Norris told Chantelle that without his help as an SSPD officer she would be criminally charged and probably be sent to jail.

205.    The actions of Norris as an SSPD police officer created a power imbalance between Norris and Chantelle which intimidated Chantelle.

206.   Norris knowingly and purposefully used this power imbalance and his authority as an SSPD officer to manipulate Chantelle into believing that he was the *only* person who could assure she would avoid criminal charges.

207.   The facts set forth above show many instances where Norris used his power imbalance and his position as a police officer to intimidate and groom Chantelle for sexual harassment and to gratify his own sexual desires.

208.   Chantelle was afraid to report Norris. Norris had convinced Chantelle that he was the only SSPD officer willing to advocate for her within the police department and prevent her from false prosecution.

209.   Norris used his police power to intimidate Chantelle and to sexually assault her.

210. During the year 2020, Norris conducted two illegal traffic stops without reasonable articulable suspicion for the sole purpose of finding out what Chantelle was saying about him and threatening her to keep quiet.

211. The Tenth Circuit has recently confronted this exact issue, and ruled that such stops are not consensual, are illegal and violate clearly established constitutional rights:

> Because Defendant pulled Leyva over without at least an articulable suspicion of a violation, we conclude that Defendant violated Leyva's clearly established Fourth Amendment right to be free from an unreasonable seizure.

*Shepherd,* 55 F.4th at 816.

212. At various other times and places between July 2020 and March 2022, Norris followed Chantelle in his police vehicle while she was running errands. Norris often parked his police or personal vehicle near her home and stalked Chantelle during her day-to-day activities or going and coming from work. He made sure she knew he was following her. There was no reasonable suspicion or probable cause for these intimidating police activities, which constituted a Fourteenth Amendment violation for sexual harassment.

213. As a proximate result of the illegal and unconstitutional actions by Norris, Chantelle has experienced significant emotional distress and post-traumatic stress requiring professional medical care.

214.    Chantelle has been required to bear the costs of such care as well as deal with the emotional scars that will affect her for the rest of her life.

215.    Defendants' conduct warrants the imposition of punitive damages as may be allowed by law.

## SECOND CAUSE OF ACTION

### ~ *Discrimination Against Women* ~

**Violation of the Fourteenth Amendment**
**Against Assistant Chief Robertson, Chief Andrew Burton, City Manager Mark**
**Christensen, in their Individual and Official Capacities, and Against the City of**
**Saratoga Springs**

**Cognizable Under 42 U.S.C. §1983**

216.    Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

217.    The Due Process clause of the Fourteenth Amendment protects women from discrimination and disparate action based upon their gender. Such discrimination violates the Fourteenth Amendment Equal Protection clause.

218.    Fifty years ago, the U.S. Supreme Court acknowledged the sad history of discrimination on the basis of gender in the United States. In *Frontiero v. Richardson*, the U.S. Supreme Court stated:

> There can be no doubt that our Nation has had a long and unfortunate history with sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage. … It is true, of

30

course, that the position of women in America has improved markedly in recent decades. Nevertheless, it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market, and, perhaps most conspicuously, in the political arena.

*Frontiero v. Richardson*, 411 U.S. 677, 685-86 (1973). This "pervasive … more subtle, discrimination" against women is at the core of the gender-based discrimination practiced by Saratoga Springs and SSPD officials as alleged herein.

219.   The individual Defendants and others were, at all relevant times, officials of the SSPD and the City of Saratoga Springs. The Defendants all had final policy making authority.

220.   Saratoga Springs and SSPD officials with final policy making authority had a duty to respond to Chantelle's reports of sexual harassment, stalking, sexual assault, criminal conduct, intimidation and gender-based discrimination against her (hereinafter collectively, the "wrongful conduct").

221.   Saratoga Springs and SSPD officials with final policy making authority exercised discretion at the moment they decided how to respond to reports of the wrongful conduct against Chantelle.

222.   Saratoga Springs and SSPD officials with final policy making authority exercised discretion at the moment they decided how to respond to Chantelle's reports of wrongful conduct by an SSPD officer (later identified as

Norris).

223.    Saratoga Springs and SSPD officials with final policy making authority exercised discretion at the moment they decided how to respond to reports that Chantelle was being discriminated against on the basis of her gender.

224.    The power and discretion to determine how Saratoga Springs and SSPD officials with final policy making authority would respond to Chantelle's reports of the wrongful conduct was possible because state law vested such officials with the authority to respond to such reports.

225.    Accordingly, Saratoga Springs and SSPD officials with final policy making authority were acting under color of state law when they exercised discretion in determining how they would respond to Chantelle's reports of the wrongful conduct, including discrimination on the basis of her gender.

226.    In exercising this discretion, Saratoga Springs and SSPD officials discriminated against Chantelle on the basis of her gender.

227.    In determining how to exercise their discretion in responding to Chantelle's reports as described herein, Saratoga Springs and SSPD officials, with final policy making authority, based their decisions on irrational gender stereotypes through the mechanical application of traditional, yet inaccurate, assumptions about the nature of men and women and their proper roles in society.

**228.** These gender stereotypes followed by CSS and SSPD include, but are not limited to:

(a)    that women are unreasonable, irrational, hysterical and hypersensitive;

(b)    that women overreact to situations;

(c)    that women are spiteful;

(d)    that women fabricate reports of abuse or harassment to get attention;

(e)    that women have ulterior motives when they report abuse, harassment or sexual assault;

(f)    that women are often untruthful when they report abuse or harassment;

(g)    that men often have a legitimate reason for abusing or harassing women;

(h)    that women often deserve, encourage, provoke or enjoy the harassment or abuse that they report;

(i)    that women who look or act a certain way are "tramps" or "sluts";

(j)    that women send mixed signals to men;

(k)    that women cannot be trusted and that men are therefore justified in questioning their honesty and/or fidelity;

(l)    that men cannot control their primal urges, i.e. "boys will be boys";

(m)    that women have the power to end harassment or abuse on their own;

(n)    that a woman who is actually being harassed or abused will always seek help on their own behalf;

(o)    that women should be accommodating and subservient to men;

(p)    that men have the right to exercise authority over women; and/or

(q)    that women hate men and will take drastic measures to cause them harm.

229.    The CSS and the SSPD, through their officials with final policy making authority, classified Chantelle by her gender and engaged in differential treatment that violated her right to equal protection under the Fourteenth Amendment of the United States Constitution.

230.    By so doing, the Defendants acquiesced in the wrongful conduct, including stalking, abuse, intimidation, sexual harassment, sexual assault, and gender based discrimination, when they were deliberately indifferent to Chantelle's reports as described herein.

231.    Additionally, or in the alternative, CSS and the SSPD, through their officials with final policy making authority, classified Chantelle by her gender and engaged in differential and belittling treatment that violated her right to equal protection under the Fourteenth Amendment of the United States Constitution.

232.    By so doing, CSS and SSPD acquiesced in the wrongful conduct

when they made decisions on how to respond to Chantelle's reports based on irrational gender stereotypes, thereby dismissing her complaints and requests for help involving Norris' behavior and employing unacceptable mentalities that blame women for their abuse by men.

233. In the alternative, even if the Defendants were not Saratoga Springs or SSPD officials with final policy making authority, their response to Chantelle's reports of sexual harassment and sexual assault was based on irrational gender stereotypes. Defendants used classifications based on gender. Their differential treatment of Chantelle was based on the use of classifications based on gender and their failure to investigate or otherwise respond to the complaints of sexual harassment and sexual assault was based on their deliberate indifference to the sexual harassment and assault Chantelle endured.

234. Defendants' failure to implement appropriate policies and procedures that were obviously necessary to address serious sexual assault and sexual violence were representative of an official policy or custom of CSS and the SSPD that deprived Chantelle of her constitutional right to equal protection under the Fourteenth Amendment.

235. The use of classification based on gender by Saratoga Springs and SSPD officials with final policy making authority and their differential treatment

on the basis of gender was not substantially related to achieving an important governmental interest.

236.   The deprivation of equal protection under the law left Chantelle vulnerable to ongoing stalking, abuse, intimidation, sexual harassment, sexual assault, threats of retaliation, threats of physical harm, and other gender based discrimination.

237.   This deprivation indicated that CSS and SSPD officials with final policy making authority either overtly or silently condoned Norris' conduct.

238.   Chantelle otherwise suffered additional harm and incurred damages, as set forth herein, as a result of the deprivation of her Fourteenth Amendment equal protection rights.

239.   To the extent that employees or agents of the City of Saratoga Springs, including administrators in the SSPD, were officials with final policy making authority, knowledge obtained by such employees or agents within the course and scope of the employment or agency relationship is imputed to the City of Saratoga Springs and other city officials with final policy making authority.

240.   The City of Saratoga Springs is independently liable for actions that it took or failed to take in light of the knowledge that was imputed to it through employees or agents of CSS, such as the SSPD, and through officials of CSS with

final policy making authority.

241.   Due to the actions of these Defendants as described in this cause of action, Chantelle has been damaged as set forth herein.

242.   Defendants' conduct warrants the imposition of punitive damages insofar as it is authorized by law.

# THIRD CAUSE OF ACTION

### ~ *Municipal Liability* ~

### *Violation of the Fourteenth Amendment*
### *Against the City of Saratoga Springs*

### Cognizable Under 42 U.S.C. §1983

243.   Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

244.   To establish municipal liability, "a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

245.   Establishment of a municipal policy or custom "may take the form of … the decisions of employees with final policymaking authority." *Id.*

246.   In early July 2019, the final decision or policy making authority regarding Chantelle's case was delegated by Chief Burton to Assistant Chief

Robertson.

247.   In July and August 2019, Robertson ordered his officers to use whatever means possible to find evidence of criminal activity by Chantelle in order to charge and incarcerate her.

248.   Robertson explained to subordinates that the SSPD's goal was to "run Chantelle Jones out of the city."

249.   Robertson, employing gender stereotypes, explained to Chief Burton and SSPD officers that they should not believe Chantelle because she could not be trusted, that she was making up the wrongful conduct to get attention.

250.   Robertson's orders and directives constituted "policy and custom" of CSS and SSPD.

251.   Robertson's orders and directives led to a search of Chantelle's house meant only to harass and intimidate Chantelle.

252.   Robertson's orders and directives led to multiple SSPD officers following Chantelle for no justifiable reason.

253.   Robertson's orders and directives led to Norris sexually harassing and assaulting Chantelle because Norris knew he would not be questioned about it because of Robertson's clear disregard for Chantelle.

254.   Robertson's orders and directives led to Norris conducting illegal

and unconstitutional traffic stops on Chantelle because Norris knew he would not be questioned or punished for having done so.

255. During that same period and continuing through late 2020, Robertson regularly met with Christensen, the City Manager, and updated him on actions relating to the SSPD's treatment of Chantelle.

256. Christensen supported and condoned all of Robertson's orders and directives.

257. Knowing that Robertson's treatment of Chantelle was inappropriate, Christensen, at no time, requested that SSPD officers be disciplined or trained on proper treatment of Saratoga Springs' citizenry.

258. Robertson's decision-making authority in the SSPD as it applied to Chantelle's case amounted to setting a "policy and custom" for subordinate SSPD officers that were dealing with her.

259. This "policy and custom" established by Robertson was condoned and supported by Chief Burton and Mark Christensen.

260. The "policy and custom" established by Saratoga Springs officials was the proximate cause of SSPD's violations of Chantelle's 14th Amendment rights to due process.

261. The "policy and custom" established by Saratoga Springs

officials and their condoning of intimidating and harassing actions was a significant cause of Norris' sexual harassment of Chantelle because he believed he would not be penalized for such actions.

262.   Burton and Christensen knew that Robertson's policies would violate Chantelle's constitutional rights and cause injury and/or harm to her. Nevertheless, knowing of the harm that was being caused, they deliberately did nothing to stop or curtail Robertson's actions and the actions of SSPD officers, especially Norris, who were being directed by him.

263.   Plaintiff has been damaged as set forth herein.

264.   Defendant's conduct warrants the imposition of punitive damages as may be allowed by law.

## FOURTH CAUSE OF ACTION

### ~ *Executive Abuse of Power* ~

**Violation of the Fourteenth Amendment**
**Against Assistant Chief Robertson, Chief Andrew Burton, and City Manager**
**Mark Christensen in their Individual Capacities**

**Cognizable Under 42 U.S.C. §1983**

265.   Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

266.   The Due Process clause of the 14th Amendment is "intended to prevent government officials from abusing [their] power, or employing it as an

instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (brackets in original).

267.    The executive abuse of power by a public official "represents 'arbitrary action of government.'" *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting *Lewis*, at 846).

268.    Defendant Robertson, as an officer of the SSPD, had powers granted to him by the State of Utah which gave him the authority to detain, initiate search warrants, recommend criminal charges, and/or to arrest Chantelle if the alleged facts appropriately permitted it.

269.    Defendant Robertson, as an Assistant Chief, had authority over other officers within the SSPD to order them to take or not to take action regarding Chantelle.

270.    Defendant Burton had powers granted to him by the State of Utah and was authorized to detain, initiate search warrants, recommend criminal charges, direct or permit other officers to take actions against Chantelle, and/or to arrest Chantelle if the alleged facts appropriately permitted it.

271.    Defendant Burton, as the SSPD Chief, had authority over other officers within the SSPD, namely Robertson, to order them to take or not  take action regarding Chantelle.

272.   Defendant Burton was fully aware of Robertson's actions and either affirmatively or tacitly approved of each of the actions taken against Chantelle.

273.   Defendant Christensen had powers granted to him by CSS to hire and fire the City's Chief of Police and to oversee the operations and activities of CSS's police department.

274.   Defendant Christensen was well aware of the actions Defendants Burton and Robertson, as well as other officers, were taking regarding Chantelle. He either affirmatively or tacitly approved of each of their actions against her.

275.   Defendant Robertson abused his authority for the purpose of intimidating and harassing Chantelle by ordering officers to arrange for a search of Chantelle's residence based upon a fraudulent warrant.

276.   Robertson abused his power and authority when he threatened Chantelle with future police action by saying, "Just you wait and see what's coming to you," and "You are going to prison for a long time," without any supporting evidence.

277.   Robertson abused his power and authority when he ordered subordinate officers, without cause, to follow Chantelle whenever possible and stop her without reason to intimidate and harass Chantelle.

278.    Robertson abused his power and authority when he ordered subordinate officers to find or create false and exaggerated charges against Chantelle as a way to have her arrested and incarcerated, or to force her to leave town.

279.    Robertson abused his power and authority when he told subordinate officers that he wanted them to do whatever they could to harass and intimidate Chantelle in order to "run her out of the city."

280.    Robertson abused his power and authority when he ordered Chuchran to find, exaggerate or create evidence of criminal activity in Chantelle's case so that they could take charges to be screened by the District Attorney.

281.    Burton and Christensen were both aware of Robertson's actions and fully condoned his activities. As such, they also bear liability for Robertson's actions.

282.    The actions of Robertson, Burton and Christensen led to subordinate officers intimidating and harassing Chantelle; an improper search of her home based on exaggerated or false claims; and other actions meant to harass and intimidate Chantelle.

283.    The abuse of power demonstrated by Robertson, Burton and Christensen shocks the conscience and is abhorrent to reasonable people as well as reasonable officers of the law.

284. Plaintiff has been damaged as set forth herein.

285. Defendants' conduct warrants the imposition of punitive damages as may be allowed by law.

## FIFTH CAUSE OF ACTION

### ~ *Unlawful Seizure* ~

**Violation of the Fourth Amendment**
**Against Officer Norris in his Individual Capacity**

**Cognizable Under 42 U.S.C. §1983**

286. Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

287. It is clearly established that "A traffic stop is a seizure under the meaning of the Fourth Amendment." *U.S. v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).

288. It is also clearly established that a traffic stop is only valid "under the Fourth Amendment if the stop is based on an observed traffic violation or if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787.

289. The Tenth Circuit recently held:

[O]ur reasonableness inquiry requires that an *officer observe or have an articulable suspicion of a traffic violation before making a stop regardless of any other subjective motives the officer might have.* A

reasonable officer in Defendant's shoes would have known that. Defendant admits he did not possess any reason to stop Leyva when he pulled her over. He never asked for her license or registration. And he issued no citation. … Because Defendant pulled Leyva over without at least an articulable suspicion of a violation, we conclude that Defendant violated Leyva's clearly established Fourth Amendment right to be free from unreasonable seizure.

*Shepherd,* 55 F.4th at 816 (emphasis added).

290.   Norris conducted a traffic stop, with lights and siren activated, on Chantelle on both June 10, 2020, and June 14, 2020. He was in full uniform and operating an SSPD vehicle during both events.

291.   Chantelle did not know that Norris was the officer conducting the traffic stop until he arrived at her car, and she rolled down her window.

292.   Chantelle never encouraged or consented to either of the stops.

293.   Norris never disclosed to Chantelle a traffic violation or any suspicion of an equipment violation during *either* traffic stop.

294.   There was no reasonable suspicion of any kind of a traffic violation or other basis to stop Chantelle at either one of the stops.

295.   Norris never requested that Chantelle provide her driver's license or her insurance information.

296.   Both stops were conducted solely to threaten and intimidate Chantelle.

297.    The actions of Norris violated Chantelle's clearly established Fourth Amendment constitutional right to be free from an unlawful seizure.

298.    Plaintiff has been damaged as set forth herein.

299.    The conduct of Norris warrants the imposition of punitive damages as may be allowed by law.

## SIXTH CAUSE OF ACTION

### ~ *Conspiracy* ~

**Violation of the Fourteenth Amendment**
**Against Assistant Chief Robertson, Chief Andrew Burton, and City Manager Mark Christensen in their Individual Capacities**

**Cognizable Under 42 U.S.C. §1983**

300.    Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

301.    "For a valid §1983 conspiracy claim, plaintiffs must plead and prove not only a conspiracy, but also an actual deprivation of rights." *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990).

302.    "To prove a conspiracy under §1983, a plaintiff must show 'at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds ... or a general conspiratorial objective.'" *Frasier v. Evans*, 992 F.3d 1003, 1024 (10ᵗʰ Cir. 2021) (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010)).

303.   In early March 2019, Robertson met with Burton and Christensen, together and separately, and explained to them "the case" regarding Chantelle Jones.

304.   By July 2019, Robertson had met with Burton and Christensen multiple times, both together and separately, updating them on Chantelle's "case."

305.   In July 2019, Robertson discussed with Christensen how to "manage" Chantelle's case. Together, they decided that Robertson would order SSPD officers to find or create fictitious evidence sufficient to charge Chantelle with criminal activity.

306.   Christensen and Robertson had a meeting of the minds as to the SSPD's actions regarding Chantelle.

307.   Robertson implemented the joint plan when, in July and August 2019, he ordered his officers to find ways to "run Chantelle Jones out of the city."

308.   Robertson further implemented the joint plan when, in September 2019, he threatened Chantelle, without cause, saying "just you wait and see ..." and "you are going to prison for a long time."

309.   Robertson further implemented the joint plan in 2020, when he ordered Chuchran to create evidence of criminal activity so that they could screen charges against Chantelle.

310.    These actions by Robertson, Burton and Christensen deprived Chantelle of her 14th Amendment due process rights.

311.    Plaintiff has been damaged as set forth herein.

312.    Defendants' conduct warrants the imposition of punitive damages as may be allowed by law.

# SEVENTH CAUSE OF ACTION

*~ Violation of State Civil Rights ~*

*Against all Defendants*

**~ Pursuant to the Court's Supplemental Jurisdiction
Under 28 U.S.C. §1367 ~**

313.    Plaintiff incorporates herein by reference all other facts and allegations set forth in this Complaint.

314.    Article I, Section 7 of the Utah State Constitution states in relevant part:  "No person shall be deprived of life, liberty or property, without due process of law."

315.    Article I, Section 14 of the Utah State Constitution states that "[t]he right of the people to be secure … against unreasonable searches and seizures shall not be violated."

316.    Defendants' actions willfully and recklessly disregarded and violated Chantelle's state constitutional civil rights as set forth above and as

described herein.

317.    The sexual harassment and sexual assault of Chantelle by Officer Norris constituted reckless and willful misconduct and violated Chantelle's state constitutional rights.

318.    Assistant Chief Robertson violated Chantelle's civil rights by ordering his subordinate officers to find evidence, by whatever means necessary, to charge Chantelle with criminal charges and incarcerate her.

319.    Robertson's orders subsequently led to an illegal search meant to intimidate Chantelle. Those orders also led to regular stalking and tailing by SSPD police officers of Chantelle meant to harass and intimidate her.

320.    Officer Norris purposefully and willfully violated Chantelle's civil rights when he detained her for no other reason than to flirt with her and later to threaten her.

321.    Robertson's orders to intimidate and harass Chantelle led to an unreasonable search of her residence.

322.    Plaintiff has been damaged as set forth herein.

323.    Defendants' conduct warrants the imposition of punitive damages as may be allowed by law.

## JURY DEMAND

Trial by jury is requested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for damages in amounts set forth below, or in amounts to be determined by a jury at trial, as follows:

1.  For general and compensatory damages in the amount of $4,000,000, or in an amount to be reasonably determined at trial;

2.  For special damages to be established at trial and as may be allowed by law;

3.  For punitive damages against Defendants to be established at trial and as may be allowed by law;

4.  For pre-judgment interest on the damages assessed by the Court, as allowed by law;

5.  For costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. 1988; and as otherwise may be allowed by Utah State or federal law; and,

6.  For such other and further relief as the Court deems just and proper.

DATED this 9th day of January, 2023.

SYKES MCALLISTER LAW OFFICES, PLLC

*/s/ Robert B. Sykes*
ROBERT B SYKES
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiffs*